Filed 5/16/16  In re William V. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re WILLIAM V., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM V.,<br><br>Defendant and Appellant. | B267270<br>(Los Angeles County<br>Super. Ct. No. DK08205) |

APPEAL from orders of the Superior Court of Los Angeles County, Akemi Arakaki, Judge.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel and R. Keith Davis, Acting Assistant County Counsel and Olivia Raquel Ramirez, Deputy County Counsel, for Plaintiff and Respondent.

Appellant William V. (Father), father of three-year old William V. (William) appeals the juvenile court's jurisdictional and dispositional orders. He contends substantial evidence does not support the court's finding that William was at risk of sexual abuse within the meaning of Welfare and Institutions Code section 300, subdivision (d) based on Father's sexual abuse of a eight-year old female half-sibling.[1] He further contends substantial evidence does not support the court's finding that his use of methamphetamine placed William at risk within the meaning of section 300, subdivision (b). Finally, he contends the court erred in issuing an order removing William from his custody because he did not have custody of William within the meaning of section 361, subdivision (c). Alternatively, he contends the evidence was insufficient to justify the removal order. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Department of Children and Family Services (DCFS) in November 2014, when William's half-sister, Elizabeth D., then eight years old, told school officials and a sheriff's deputy that Father (not Elizabeth's biological father) had touched her inappropriately on three separate occasions.[2]

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Mother and Father were not married and did not live together. At the time of DCFS intervention, their relationship had been over for approximately six months. During the week, William lived with Mother and his half-siblings, Elizabeth and Jonathan. He spent the weekends with Father.

A. *Evidence Pertinent to Sexual Abuse Allegation*

Questioned by the caseworker and another sheriff's deputy the next day, Elizabeth described the three incidents in more detail. The first incident occurred in September, after Father picked her up from school. He drove her to his home where they were alone together. He pulled her pants and underwear down and touched her vaginal area. He then took off his clothing and lay on top of her, and she felt his penis touch her. A second similar incident occurred shortly thereafter, when she and Father were supposed to be shoe shopping. He took her to his home and engaged in similar conduct as on the first occasion. The third incident occurred in front of William and Jonathan, while they were all watching television in Father's room.[3] Father took the girl's pants off and touched her vaginal area. Father instructed her not to tell anyone. Elizabeth also said Father had shown her a book containing pictures of naked boys and girls.

Mother was interviewed and said that four or five months earlier, Elizabeth had accused Father of touching her inappropriately but had then recanted.[4] She confirmed that Father had recently taken Elizabeth to buy shoes, and that it was not uncommon for Father to pick Elizabeth up from school.[5] Prior to reporting the

---

[3]    William, age two at the time, was pre-verbal. Jonathan, then age seven, was autistic and also pre-verbal.

[4]    The original and amended petitions alleged that Mother failed to protect the children from Father. At the jurisdictional hearing, after hearing all the evidence, the court struck the allegation. Once Mother was deemed nonoffending, the court also struck the allegations pertaining to Elizabeth and Jonathan. Accordingly, Mother is not a party to this appeal, and Elizabeth and Jonathan are not subjects of this appeal.

[5]    At the request of law enforcement officials investigating the sexual abuse allegations, the caseworker avoided interviewing Father about them. Father was referred to a sexual abuse awareness program for perpetrators, but refused to participate on the advice of counsel. A detective interviewed Father in March 2015. Father denied the abuse. Father said he had been around Elizabeth since her father died and that he "'saw [her] as [his] own'" and wanted to be "the dad she didn't have."

3

abuse, Elizabeth referred to Father as "Daddy" and was close to him. Mother noticed her positive feelings about him changing around September 2014.

After the November 2014 detention hearing, Elizabeth was interviewed by a detective.[6] Elizabeth initially told the detective Father touched her inappropriately on multiple occasions. After the detective said it was important to tell the truth, Elizabeth denied the abuse occurred, and said she did not like Father or want him around Mother.

In January 2015, a forensic interview of Elizabeth was arranged. She confirmed the abuse and provided more detail than in prior interviews. Elizabeth told the examiner that Father had given her an inappropriate book, and had shown her sexual videos and pictures of naked people. She said Father hurt her by trying to put his penis into her anus and vagina, and had her put her mouth on his penis and rub his penis with her hand. She described him making thrusting motions, moaning and ejaculating. She said she recanted when interviewed by the detective because the detective claimed that Father had passed a lie detector exam and threatened her with "kid's jail."[7] She also said she was afraid of Father. The forensic interviewer and the caseworker concluded, based on Elizabeth's demeanor and the specificity she provided, that she was telling the truth.

At the August 2015 jurisdictional hearing, Elizabeth testified that appellant touched her vaginal and anal areas with his hand and penis on multiple occasions, and that he had her touch his penis with her mouth. She confirmed that on one

---

[6] DCFS left custody of the children with Mother, and detained William from Father. At the detention hearing, the court placed temporary custody of the children with DCFS, but released them to Mother. It granted Father twice weekly monitored visitation with William.

[7] Elizabeth had previously told Mother that, despite what she said to the detective, the allegations were true.

4

occasion, William and Jonathan were in the room when inappropriate touching occurred. She said she had recanted because she was afraid Father would hurt her.

B. *Evidence Pertinent to Drug Abuse*

Interviewed by the caseworker, Mother reported that Father was a habitual user of "crystal meth," that he started using methamphetamine at the age of 16 to 18, and that he had been using it consistently since. Mother said Father's drug use had had a negative impact on his life, causing him to sleep all day and display a bad temper. She said his drug use caused him to have little patience with Jonathan, her autistic child, and led to the breakup of their relationship.

In January 2015, Father admitted having used methamphetamine "'on and off'" for the prior four or five years. He admitted his drug use had "'a real negative impact on [his] life,'" and caused "'a lot of damage'" to himself and his relationship with Mother. He claimed to have given up drug use for William's sake and to have been clean for 10 months. He denied ever using drugs at home or around the children, or on the weekends when he had custody of William.

Father became unemployed in January 2015, and was still unemployed at the time of the jurisdictional hearing, seven months later. He had a 2013 arrest for possession of methamphetamine, which led him to participate in a court-ordered drug program. Mother said Father stopped using drugs after his arrest and enrollment in the drug program, but started up again not long thereafter. In February 2015, three months after the detention, Father enrolled in an outpatient treatment program. Father tested positive for amphetamine and methamphetamine in April 2015 and July 2015. He had negative drug tests in December 2014, and in January, February, March and June 2015, but missed scheduled tests in January, February, March, April, May, June and July 2015.

5

C. *Trial Court's Ruling*

At the August 2015 jurisdictional hearing, counsel for DCFS, the children, and Mother urged the court to find the allegations of sexual abuse and drug use on the part of Father true. Counsel for Father argued that Elizabeth was not credible due to her history of making and recanting abuse allegations, and urged the court to find that Father had not abused Elizabeth. Father's counsel further argued that the evidence did not support a connection between Father's drug use and risk to William, stressing the lack of direct evidence that Father was ever high when caring for the boy. Counsel did not ask the court to find that William would not be at risk of sexual abuse even if the court found Elizabeth credible and her allegations true.

The court found, based on the details in Elizabeth's descriptions of the sexual activities she had been subjected to, that Father had sexually abused her. Specifically, the court found true that "[o]n numerous occasions" Father engaged in inappropriate touching and placed his penis on the girl's vagina and bottom, and that on one occasion Father undressed and fondled Elizabeth while William and Jonathan were present in the room. The court further found that these actions endangered William's physical health and safety and placed him at risk of physical harm, damage, danger and sexual abuse within the meaning of section 300, subdivision (d) (sexual abuse).[8] The court also found true that Father was a current user of methamphetamine, which impaired his ability to provide proper care and supervision of William, endangering William's physical health and safety and placing him at risk of physical harm and damage within the meaning of section 300, subdivision (b) (failure to protect).

---

[8]    The court dismissed duplicative allegations asserted under section 300, subdivision (j) (abuse of a sibling).

The court ordered William to be "removed from [Father]," and placed in the home of Mother.  It directed DCFS to provide family maintenance services to Mother.  It instructed Father to complete a substance abuse program with random testing and aftercare, a 12-step program, and a program of sexual abuse counseling for perpetrators.  Its order provided Father two hours of monitored visitation with William, twice per week.  Father appealed.

**DISCUSSION**

A.  *Jurisdiction*

    1.  *Sexual Abuse*

Father contends the evidence establishing that Father sexually abused an older, female half-sibling was insufficient to support that William was at risk of sexual abuse.  For the reasons discussed, we disagree.

Section 300 permits the juvenile court to assert jurisdiction over a child who falls within the provisions of one of its subdivisions, including a child who has been sexually abused or is at substantial risk of being sexually abused (§ 300, subd. (d)), or a child whose siblings have been abused in a manner that suggests the child is at risk of similar abuse (*id*., subd. (j)).  (See *In re I.J.* (2013) 56 Cal.4th 766, 772 (*I.J.*).)  DCFS has the burden of proving by a preponderance of the evidence that the child falls under one of the subdivisions of section 300.  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)  "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or

7

exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citations.]'" (*Ibid.*)

Prior to the Supreme Court's 2013 decision in *I.J.*, appellate courts were divided over whether evidence of a parent's sexual abuse of a child of one gender could justify the assertion of jurisdiction over a child of the opposite gender.[9] Observing that "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction," but requires only a "'substantial risk'" of abuse, the Supreme Court found that the risk of sexual abuse to a child whose opposite gender sibling had been abused was not "nonexistent or so insubstantial that the juvenile court may not take steps to protect the [child] from that risk." (*I.J., supra,* 56 Cal.4th at pp. 773, 779-780.) Accordingly, it held that "a father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents." (*Id*. at p. 770.)

In so holding, the court explained that juvenile courts may consider the following factors, set forth in section 300, subdivision (j), to assist in determining the degree of risk of harm to a child whose sibling has been sexually abused: "'the

---

[9]    (Compare *In re Rubisela E.* (2000) 85 Cal.App.4th 177, 198-199, disapproved in part in *I.J.*, *supra*, at 56 Cal.4th 766 and *In re Maria R.* (2010) 185 Cal.App.4th 48, 68, disapproved in part in *I.J.*, *supra,* at p. 766 [reversing assertion of jurisdiction over boys based on fathers' sexual abuse of older sisters], with *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1414, *In re P.A.* (2006) 144 Cal.App.4th 1339, 1345-1347, and *In re Karen R.* (2001) 95 Cal.App.4th 84, 90-91 [agreeing with juvenile court that fathers' sexual molestation of daughters placed sons at risk].)

8

circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.'" (*I.J.*, *supra*, 56 Cal.4th at p. 774, quoting § 300, subd. (j).) Courts also may consider the egregiousness of the abuse and the "violation of trust" shown by sexually abusing one child at a time and place where other children "could easily have learned of or even interrupted the abuse." (*I.J.,* at p. 778.) In other words, juvenile courts are to consider "the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm." (*Id*. at p. 774.) "[A]fter considering the nature and severity of the abuse and the other specified factors, the juvenile court is . . . to use its best judgment to determine whether or not the particular substantial risk exists." (*Id*. at p. 779.)[10]

Father contends the instant case is distinguishable because the father in *I.J.* abused his own biological daughter, whereas the victim here was unrelated to Father. Nothing in *I.J.* suggests juvenile courts are to apply a different analysis when the abused sibling is not the biological child of the abuser. The factors identified by the Supreme Court are equally applicable to that situation. Here, the evidence established that Father had a long-term relationship with Mother beginning when Elizabeth was quite young, that Elizabeth considered him to be her

---

[10]  Father asserts that the holding in *I.J.* does not compel a finding that a sibling of the opposite gender of the sexually abused child is at risk of harm. We have no quarrel with that proposition. (See *I.J.*, *supra*, 56 Cal.4th at p. 780 ["In upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold the evidence in this case supports the juvenile court's assertion of jurisdiction."].) Nothing in the record below indicates the juvenile court did not apply the correct standard in making its jurisdictional finding, and Father does not suggest otherwise in his brief.

"daddy," and that Father viewed Elizabeth as his own child. Father's assumption of a parental role over Elizabeth from a young age and his abuse of that position supports a finding that he could not be trusted to maintain appropriate behavior around his biological child.

Appellant further contends *I.J.* is distinguishable because the abuse of Elizabeth was not "prolonged," "'egregious'" or "'aberrant in the extreme.'" We disagree. The evidence established that the abuse began barely a month after Elizabeth's eighth birthday. The court specifically found that Father not only took Elizabeth's clothing off and touched her genital and anal areas with his hand and penis on multiple occasions, but that he molested Elizabeth in the presence of William. These findings were sufficient to support the assertion of jurisdiction. (See, e.g., *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1332 [father's sexual abuse of 11-year old with mental disabilities on couch in living room where abuse could have been observed by other children supported "the commonsense conclusion that most every person in the family home was at risk of sexual abuse"]; *In re R.V.* (2012) 208 Cal.App.4th 837, 846-847 [upholding jurisdictional finding where boy witnessed father's abuse of older sibling and attempted to help her resist]; *In re Andy G., supra,* 183 Cal.App.4th at pp. 1411-1415 [upholding jurisdictional finding as to son where father exposed himself to stepdaughter while the boy was in the room].)[11] The abuse was less prolonged than in *I.J.* only because Elizabeth reported it promptly. Moreover, Father unnecessarily intensified Elizabeth's injury and anguish by denying the first incident when confronted by Mother, and continuing and escalating the abuse once he convinced Mother of the falsity of the

---

[11]    As the court stated in *I.J.*, the possibility that the child could have witnessed the sexual abuse of the sibling is "relevant to the totality of the circumstances surrounding the sibling abuse" which the court should consider in determining whether the child is at risk. (*I.J., supra,* 56 Cal.4th at p. 778.)

10

accusation. Father never acknowledged any inappropriate behavior, and rejected therapy designed to prevent similar incidents from recurring. In short, the totality of the circumstances surrounding the abuse of Elizabeth supported the court's determination that William was at risk of similar abuse. We find no basis to reverse the court's jurisdictional finding under subdivision (d) of section 300.

### 2. *Failure to Protect*

Father contends substantial evidence did not support a nexus between his use of methamphetamine and risk of harm to William. "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*I.J.*, *supra*, 56 Cal.4th at p. 773, quoting *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Nevertheless, we observe that the contention fails on the merits.

Appellant cites *In re Drake M.* (2012) 211 Cal.App.4th 754, which held that "the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found," and that a jurisdictional finding must be supported by evidence of "a current substance abuse problem . . . ." (*Drake M., supra,* 211 Cal.App.4th at pp. 764, 766.) The court defined proof of a substance abuse problem to include "recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home"; "recurrent substance-related legal problems"; and "'continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the

11

substance . . . .'" (*Id*. at pp. 766-767.) The evidence presented here met the court's requirements. The numerous positive and missed tests throughout 2014 established that Father was a chronic user of methamphetamine. Father himself admitted that the drug he had taken for years "'had a real negative impact on [his] life,'" and did "'a lot of damage,'" including ruining his relationship with Mother. Mother confirmed that Father's habitual drug use had an adverse impact on his temper and caused him to lose patience with her disabled son. At the time of the jurisdictional hearing, Father had been unemployed for many months. He was arrested and completed a treatment program in 2013, but relapsed not long thereafter. He entered a new treatment program in February 2015 after a referral by DCFS, but was unable to refrain from using the drug, even though he knew positive and missed tests would negatively affect his ability to reunite with his child. Moreover, in determining the effect of drug use on Father's behavior, the court was not required to ignore the evidence that he repeatedly molested an eight-year old girl entrusted to his care. On the evidence presented, the court could reasonably find that Father was a substance abuser, whose use of illegal drugs led to aberrant sexual behavior and to a failure to fulfill major interpersonal obligations, and that William could not safely be entrusted to his care. Accordingly, the court's finding that William was at risk within the meaning of section 300, subdivision (b) as a result of Father's methamphetamine use was supported by substantial evidence, and formed an independent basis for assertion of jurisdiction over William.

B. *Dispositional Order*

After finding that a child is a person described in section 300 and therefore the proper subject of dependency jurisdiction, the court must determine "the proper disposition to be made of the child." (§ 358.) "A dependent child shall not be

taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of [at least one of the circumstances listed in paragraphs (1) to (5)] . . . ." (§ 361, subd. (c).) Section 361, subdivision (c)(4) permits removal if "[t]he minor or a sibling of the minor has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent . . . ."

Father contends the court lacked authority to order William "removed" from him because he was not the custodial parent within the meaning of section 361, subdivision (c). (See *In re B.L.* (2012) 204 Cal.App.4th 1111, 1117 ["'[T]here can be no removal of custody from a parent who does not have custody in the first place.'"].) Here, Mother and Father shared custody of William, who routinely lived with Mother during the week and with Father on weekends. Prior to the initiation of the underlying proceedings, there was no court order limiting Father's legal rights or granting physical custody to Mother. The fact that William regularly resided with Father for a significant portion of time was sufficient to deem him a custodial parent. (See *In re Dakota J.* (2015) 242 Cal.App.4th 619, 628 [recognizing the term "'resides'" has historically meant ""to dwell permanently or for a considerable time""].)

Alternatively, Father contends that the evidence was insufficient to support the court's finding that there were no reasonable means to protect William absent removal. To support a dispositional order removing custody from a parent, the court may consider "a broad class of relevant evidence" (*In re Y.G.* (2009) 175 Cal.App.4th 109, 116), including the parent's "past conduct" and "present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) ""[T]he minor

need not have been actually harmed before removal is appropriate  The focus of the statute is on averting harm to the child." [Citation.]'" (*In re John M*. (2012) 212 Cal.App.4th 1117, 1126.)  The court's jurisdictional findings represent prima facie evidence that the child cannot safely remain in the home.  (*Ibid*.; *In re Cole C*., *supra*, 174 Cal.App.4th at p. 917; *In re T.V*. (2013) 217 Cal.App.4th 126, 135.) According to the court's jurisdictional findings, Father repeatedly molested William's eight-year old sister, once in the presence of William and his autistic brother.  Despite acknowledging the adverse impact of his use of methamphetamine and notwithstanding his enrollment in a drug treatment program, he continued to use.  The court was entitled to conclude, based on this evidence, that removal from Father was the only reasonable means to protect William's safety.

**DISPOSITION**

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

15